May it please the court. Good morning, your honors. My name is Louis Muller, and I represent Adrian Macias-Curiel. Mr. Fife and I decided that he would go first, and then I will follow him. Oh, okay. Let me get a little exercise this way. That's variety, your honors. And you are representing the son or the father? I'm representing the son, your honor. All right. Let me ask a question right at the beginning. Did the trial court rule on your motion in limine to exclude Macias' implication of his right to remain silent? This all goes to the standard of review. I couldn't find in the record anything where the judge ruled on your motion in limine. I think that's right, your honor, that there wasn't any specific ruling on the in limine motion, because the judge said, well, let's see what happens. I can't tell until I actually hear what comes out at trial. So there was no contemporaneous objection. Therefore, the standard of review here would be plain error. If there had been a ruling on the motion in limine, that would have relieved you of that requirement. I just wanted to clarify that in my own mind. Yes, your honor. And I think, in fact, there were multiple Doyle objections at trial. In fact, there were four by my count. And so there were multiple objections, though Judge Miller did prefer to wait to hear the actual evidence before he made a definitive ruling on any of the instances. And then there were also times when no Doyle objection was made. That's correct, your honor. The sequence was this. The question didn't even arise until on rebuttal. The government brought in Agent Ballard. And then there were multiple objections. There were four Doyle objections, three of which were overruled. The only one that was sustained was where Agent Ballard made a reference to the invocation. And Judge Miller stopped that immediately. He not only sustained the objection, but he struck the testimony, admonished the jurors, and then polled the jurors to make sure that they understood. Judge Miller recognized this was a very different instance. The other cases, though, where counsel raised Doyle objections were all overruled. Even counsel's omnibus Doyle objection was raised at the end of the cross-examination of Mr. Macias. That was also overruled. So by that point, Judge Miller made pretty clear that he didn't think there was anything wrong with the government's questioning about the silence that occurred during the interview. And so subsequently there were not any specific objections. That just leaves pretty much the argument. There were no objections raised during argument. But that kind of makes sense because, after all, argument is just a summation of the evidence which the district judge has already decided was admissible. So it would be kind of pointless at that stage to object to just prosecution summarizing the evidence that's already been admitted. So there were objections during the substantive part of the evidence that came in, the references to Mr. Macias' silence. There was no objection and no problem with references to things that Mr. Macias actually said. The problem was that the prosecution's references were extremely broad. In fact, they're very much like the situation in this Court's decision in Lopez, where the prosecution's references to, did this happen at any point? Did this happen? Did there was any situation that you told the officers this? I have like practically a dozen references to very broad cases like this, instances where the prosecution made broad references. Did you ever say this? Did you ever tell the police that you did this? Did you ever tell them about this on a number of different factors? But he failed to raise any fifth objections during Macias' cross-examination. That's correct, Your Honor. That's the prosecutor's closing argument. Isn't that correct? Yes. There were no objections interposed during the cross-examination. There was an omnibus objection to all of the Doyle problems at the end of the cross-examination. That was one that was overruled by the judge. There was an actual discussion about that at, and this is at, I believe it's at, excuse me, this is on page 371, 372 of the record, where counsel at the end of the cross-examination, this was after there had been three objections brought during the testimony of Agent Ballard. Counsel, and by the way, Judge Miller made a reference to the fact that there's quite a few objections going on here. So perhaps counsel decided. Am I correct then in assuming with respect to direct examination, our standard of review would be harmless error? With respect to the cross-examination and the closing argument, our standard of review would be plain error. Is that correct? I think not, Your Honor. I think that there was an objection, the fourth Doyle objection was brought at the end of the cross-examination. There was not interposed objections, but there was an objection at the end of the cross-examination to all of the Doyle instances that occurred. And as I said, that's on page 371 and 372 of the record, where counsel, and there was an actual discussion. It was, the jury had been let out at that point, and there was a discussion, a more free discussion about the legal parameters. And Judge Miller actually gave his reasoning at this point why he thought that there was no problem with these questions occurring that went only to the interview portion. There are a couple of reasons why I think that was an incorrect decision, and that, in fact, these were Doyle, whether they occurred during the interview or not. So the only references to confining it temporarily occurred only during Agent Ballard's direct testimony. The broad-ranging, wide-scope references to silence occurred during the cross-examination, but then there was an omnibus objection at the end of the cross-examination. It's true, there were no objections raised to Doyle during the argument, but if you review the argument record, you'll see that counsel, it wasn't because counsel was unaware or asleep at the switch. Counsel made numerous objections to prosecution argument, did not make any Doyle arguments, because those had already been settled by the district court. That evidence was admissible. It seems it would be pretty futile to make objections to annoy the judge and jury to interpose objections that have been decided earlier. So one of the problems is the government is saying that there's no problem here because there's the court, the prosecutor specifically limited their questions to the interview between the Miranda warning and the invocation. But that doesn't matter in this case. One, because the only time that the prosecutor made that limitation was only in maybe one-fourth of the Doyle errors that occurred here during the testimony, direct testimony of Agent Ballard. There were at least three other episodes where they didn't so limit it. Now, how is this case distinguishable from Leavitt and Ochoa Sanchez, that the defendant waived his Miranda rights during those 20 minutes? Your Honor, that brings me to my second point of why it doesn't matter that the questions that the prosecution, even if we said that they did try to limit the questioning appropriately and sufficiently to the period of the interview, that doesn't matter because the important legal concept here is not the temporal scope of when the questions occurred, but the, if you like, the thematic scope. That is, it doesn't matter what part of the interrogation was being questioned about. What matters legally under Doyle is what types of questions were being asked. And the reason is because, and this is getting to the distinction of Ochoa Sanchez, there's an important constitutional distinction between prosecution questioning about inconsistent statements as opposed to questioning about omissions. Inconsistent statements are fair game. Omissions are violations of Doyle. And that has been held by seven different circuit courts, including the Ninth Circuit. So it's inconsistency versus silence. Correct, Your Honor. It's perfectly fine to ask about inconsistent statements. And, in fact, one inconsistent statement did turn up here, and there's no problem with that. The prosecution was free to ask about that one inconsistent statement. The problem is that they then went on and asked about unanchored omissions of other things that were not said. That, the seven circuits have held, is a violation of Doyle. If I can just explain this by giving a little line. Let me ask you this. It was a short 20-minute interview. Yes. All right. Now, you were not the trial attorney. No, Your Honor. All right. But the trial attorney, the defense counsel, could have brought out that your client or the client was being interrogated, and the client had questions posed by the officer, and the client's job was to answer those questions. And was there any cross-examination where, as far as this officer was concerned, to ask the officer, well, did you, in fact, ask a question on that particular subject? I don't believe that there was any specific questions about whether the officers had even asked these particular questions. The one question I recall where it came up was counsel asked, you directly asked him, did you know about who put the marijuana in the compartment? And counsel asked, well, didn't you skip over the question, did you previously ask? Did you even know there was marijuana in the trailer? And counsel was in the process of asking Agent Ballard that, like, did you ask the previous question, the logically previous question, that's when Agent Ballard said, well, I would have if I had the opportunity, and that's when Judge Miller stopped everything and said, no, wait, this has to be stricken, and then he pulled the jurors because he just made a reference to the invocation. And that's a little bit overboard, isn't it? As I read this, what counsel's trying to imply to the jury is perfectly obvious. Defense counsel. Yes. He's trying to imply to the jury that they did a sloppy, lousy job on this case of asking questions, and they take about, oh, weren't you trained? You were trained, weren't you, about how to ask questions, blah, blah, blah. And then they come up to a point and they say to him, ha-ha, but you didn't ask him about this, did you? And the officer, what would you expect him to say? No, I didn't. Looking at jury, see, lousy, sloppy questioning by the officer. The officer says, in fact, well, I didn't, but I would have, and then everything goes bananas. But what was he supposed to say? And if he said, no, I didn't, then on redirect, could they have said, well, why didn't you? Would you have sort of opened that area up? I don't think so, Your Honor. I mean, I agree with Your Honor that that's a possible interpretation of where the line of questioning may have been going. Well, that's what I'm saying. You're saying, right, you received training on how to conduct interviews, didn't you? Yep. Part of the training was to ask follow-up questions, right? Yeah. To get the details from an answer, right? Yeah. And then to ask another question about the details, right? Yes. And to explore it further, right? Yes. Boom. Now comes the question, right? With respect, Your Honor, I think I know this set-up as well as every other member of Federal Defenders knows this set-up. I'm sure Mr. Hoffman knows this set-up as well, that what this leads into is, why wasn't this in your report? That's the answer. That wasn't the next question. No, but that is the set-up for, did you put this into your report, knowing how important this was to follow-up and provide these details? Sure. That's the usual set-up. So you knew all that, and you didn't do it, did you? But that wasn't the question here. I mean, the next question was, you didn't do that, did you, prior to asking blah, blah, blah, blah, blah. And I'll just, well, I would have if I could have. And he doesn't even say, but he asserted his right to remain silent. He just said, if I had an opportunity, I'd have asked him. That's true, Your Honor. But I think that's a little bit, it seems to me that got a little bit misdirected and a little bit over the line at that point. I think what it shows is that Judge Miller was doing a very conscientious job of trying to keep Doyle out of here. Very sensitive. I think he was, Your Honor. I agree with that. I think the problem is that this area, in fact, of the seven circuits that have described this distinction between omissions and inconsistent statements, the Fifth Circuit described this as a subtle difference. The Seventh Circuit called it a fine line between these two. I think it's exactly the problem, is that even though counsel tried to point this out to Judge Miller, that, look, the problem here is that it's overbroad, that it's including silence as well as inconsistent statements, that Judge Miller didn't capture that. Are you talking about the cross-examination? Pardon? Are you talking about the cross-examination? Yes, at the end of the cross-examination, Your Honor. Well, the cross-examination, this guy had gotten up and testified about this whole story about how he came and the father, and they went to the aunt's house, and they went for tacos, and they went here, and they went out to the dunes, and all this strange stuff happened. That's what he said. Yes. He told the officers. He said, nope, I just came across the border, and there was my dad with the dune buggy just waiting for me. Okay? And it seems to me it impeaches him very nicely to go into, but you didn't tell him, you didn't really tell this story, did you, to the officers? You didn't have all this fancy story, which is antithetical to what you really told them. No, you didn't. By the way, I'm sorry, you've got four minutes left. Thank you, Your Honor. I did want to point out that the cases, if one looks at the cases, and these are all cited in the Lorry and Pitts case, which I cited in the reply, they make a very clear distinction of when you can talk about inconsistent statements. Inconsistent statements are, in this case, the only inconsistent statement was that my father met me at the border with the dune buggy. The questions that followed, that is no way related to the question later, so you never met Netto before. Did you ever tell the police that you went to the airport? Did you ever tell the police that you saw Netto? That is such a very, very broad scope, very different from the cases that are cited with very specific inconsistencies. Here the government, as the Fifth Circuit said, uses this as carte blanche to drag in omissions under the cover of an inconsistent statement that was completely unrelated to most of the references to silence and omission. Thank you, and I'd like to reserve my remaining time for rebuttal. Yeah, but the defense counsel really didn't do anything to ameliorate that situation on cross-examination. Well, she did bring an objection at the end. It's true that after Judge Miller had made the reference to there certainly are a lot of objections here, and then admonished the jury, gave a limiting instruction, she had made three contemporaneous objections during Agent Ballard's. She saved one omnibus objection to the Doyle material at the end of the cross-examination of Mr. Macias instead of interrupting. And that was the one substantive reasoning by Judge Miller. That was the definitive ruling at this point. If there was a definitive ruling to the in limiting motion, I think I would point to that. So here the judge considered all the evidence that had come in to that point, considered the counsel's arguments that this was overbroad and was addressing silence rather than substance, and Judge Miller said, no, I don't think that this is an example of Doyle in this case, and made that final ruling. So there was an objection. It happened that it wasn't interposed during the questioning, but it related to all the previous Agent Ballard's and the cross-examination of Mr. Macias, and then there was a definitive ruling at the end. I think that is raising the objection and getting a definitive ruling. Is this a common approach that's taken by the prosecution and by law enforcement witnesses? In what sense? Well, did you tell us about this? Did you tell us about that? Did you tell us about the other thing? I haven't seen that often, Your Honor. I think that's sort of unusual here is because clients either invoke right at the beginning or more often don't invoke at all, in which case, of course, everything they say is fair game or nothing that they say. There can be no reference to this silence because they've invoked right at the beginning. What's different here is Mr. Macias gave a partial statement, but there are cases that deal with this in this line that deal with that specific case. When they make a partial statement, it's fair game for the prosecution to go after any inconsistencies in that actual statement. What they cannot do is just have free-floating, you didn't say this, you didn't say this, because that is highlighting his invocation of silence. It's his decision not to reveal certain information. The Ochoa case allowed it because it was a complete statement. There wasn't an incomplete interview. That's correct. That's the distinction between that and this case. Yes, there was no invocation whatsoever. And also, Ochoa Sanchez was very much focused on inconsistencies, in which a later case of the Ninth Circuit, McLuta, which was referred to in the red brief and is also listed in the Fifth Circuit case that I cite, the defense cites listing the various circuit cases. McLuta also pointed that out, that this is a ñ McLuta was a case of a partial invocation, a partial statement. And there they said, that's fine, it was okay on plain error. They said it's okay because there is a direct inconsistency between what he said during his statement and that trial. What he said, this was an entrapment case, a drug bust. After his arrest, he said, I didn't think I'd get caught. And then at trial he said, I was coerced into doing this. And so that was fair game to say, look, you said before. And then it was fair to say as well, but you never said you were coerced, right? That's okay because that's directly related to the inconsistent statement. That is not the case here. None of these questions that the prosecution made was in any way logically related to the one inconsistent statement, that my dad came to the border, which Mr. Macias explained as him being confused, that he meant that my dad was on the other side of the border where the dune buggy was, not that he had actually met him physically at the border. That's not what he meant. You're over your 20 minutes. Yes, I understand. Right. Thank you. Your partner wants to say something. He will be arguing Mr. Curiel's case. Well, he took up all his time. He took up all his time. Oh, I'm sorry. That's right, Your Honor. I don't think it will take as long with this one. Your Honor, the issue here is whether or not the prior acts of the father, my client, should have been allowed in testimony and not prevented by Rule 403 and 404B. The test on the prior acts cannot be met in this case. There were two instances in this case, the first one being in April when Mr. Cisneros was stopped at the border, found to have had drugs in his vehicle, and my client happened to be in the vehicle directly behind him. Crossing the border in your vehicle legally, as far as I know, is not against the law, and the Rule 403 balancing four-part test starts with, there must be sufficient proof for the jury to find the defendant committed the other act. The other act here is just crossing the border. In the second one, which was in October of 2005, he's in a vehicle. It did have a non-factory compartment in it. However, again, there was no contraband. There was nothing found. There was no residue found, no dog alert. There was nothing illegal done by my client other than the fact that he was crossing the border, and therefore, I feel it fails on that side. He had a non-factory compartment. Yes. There was a non-factory compartment I believe was in the floorboard of that vehicle. Neither instance was there a crime committed. The total inference in the way the prosecution presented this information was all done before they even got to the fact that he was really the passenger in the vehicle that had the trailer that had the drugs in it at the time he was arrested with his son. They bring these out to try and show that he had a propensity to do this, which I think is purely totally unduly prejudicial to my client getting a fair trial in this matter, because the government obviously felt they could not prove his guilt without bringing in these two instances, and the objections were made timely, and I feel that that was erroneous and that a new trial should be ordered in this. Yeah. Okay. All right. Thank you. To refresh my memory, what was his sentence? Sixty-three months. You know, when you were sitting over there nodding your head, I thought maybe you were that prison guard. I'm sorry, Your Honor. I apologize if I distracted you. I'm glad to see you walking up here. Free man. Thank you. Your Honor, Kyle Hoffman for the United States. Good morning. Good morning. I'd like to start with the discussion of Doyle with reference to the son. I don't know about the Court, but I had a lot of trouble keeping names straight, so I try to refer to the son and the father. That's why I called him the father and the son. Thank you. And I would start off with, I believe it was Judge Nelson's question, and it segues into Judge Fernandez's question, and that's the question of what was objected to when and whether there was any testimony about the actual invocation. There were two times at which testimony got close to invocation. The one time was with Agent Ballard, and Mr. Fife, I think, pretty accurately described that. And Judge Fernandez, when the whole import was you didn't ask him this, it was a sloppy interview, and then the agent said, well, if I had the opportunity, I would have asked him that. And that was, that door was shut emphatically by Judge Miller. Immediately there was an objection. Immediately there was instruction to disregard that, and immediately there was polling. And every juror said I can disregard that. So that was really taken care of. Were you the trial lawyer here? I was not, Your Honor. Were these, was the, someone like Mr. Skourlos, were they advised about Doyle? Oh, yes, Your Honor. Did they take the stand? Your Honor, there was some discussion about Doyle before, I believe there was some discussion about Doyle before the trial was underway. But I would, to jump ahead and address a question that you had asked earlier, Mr. Skourlos, in particularly when he was talking to Agent Ballard, every single question was at any point during this interview. It was not at any point. It was at any point during this interview. Okay. That's very clear from the record of Agent Ballard's testimony. Okay. So I don't think that approaches the situation where the indication occurred. Okay. Well, I mean, yeah, at any point I noted that. But the way the interview was conducted, I take it, was that the agent asked questions and the son would answer the question. And as far as I can tell, the agent never asked questions that would have elicited that information. Judge Ferguson, I'd like to. Is that true? That was the argument of defense counsel. Well, I mean, is it true? Did he ask questions that were designed to elicit that information? The honest answer is I can't say whether he did or he didn't. I don't know. Well, why shouldn't you know that? Well, the whole back and forth about the interview was not, they didn't do a transcript, so to speak, of what the interview was. What came out, and this is what Judge Fernandez was getting to, I think, was a very distinct picture. I walked across the border. My dad was there with the dune buggy and the trailer. And that was the distinct picture that was given, and I think that's an excerpt from Record 390, if I'm not mistaken, and 336. Now, that distinct picture is very different from the distinct picture that the son gave on his first bout of testimony, which included all of this detail about ants and taco stands and we went down to the races and there were three guys and there was a guy named Neto, et cetera, et cetera. So what am I trying to say? That those stories are inconsistent. Why? Well, because they give very different pictures. They give a very different picture, and that's perfectly permissible to contrast those pictures. Nelson, I believe you brought those cases up, Ochoa Sanchez, Macaluda, I think, is the other one, and then Levitt v. Aravin. Right. But in those cases, we had a complete interview. We did not have an implication in Miranda halfway through. Suppose he'd only talked two minutes. Now, that's a good question, Your Honor, and I would suggest here's the situation. Judge Pragerson said it was a short interview, 20 minutes. I would suggest that's not necessarily so short, particularly given the testimony about his demeanor, which was a lot of this was dead time. That is, the government's position was he was basically having to think on his feet and make something up. Well, but so how did the interview start out? Well, he was Mirandized, and he waived his Miranda rights. But the picture, I've tried to give the indication that it was begrudging, let's say, is how I would characterize it. Begrudging and a little bit surly, almost. That's according to Agent Ballard. So, but the picture is. I didn't know that, that it was begrudging and surly. Well, there's testimony from Agent Ballard. I mean, it's right, it's throughout his testimony that their hands were in the pockets. He was slouching. He was looking elsewhere, not looking at the agents, and apparently Agent Ballard was demonstrating this with his own physical mimicking of the defendant's behavior, the son's behavior. But the point I'm trying to get across is. I don't know what that all means. Is he slouching? Was he supposed to be standing at attention? No, it's a question of demeanor. That was an argument about demeanor during the interview. And what I'm trying to get across is the notion that, for instance, Mr. Fife says this is about silence. I would suggest it's not. It is perhaps about omissions, but more importantly, it's about arguable inconsistency between stories. And that's perfectly permissible under Achilles-Sanchez, under, I think it's Anderson v. Charles, that's the. You mentioned Anderson. Now, Anderson permitted questioning regarding omissions in pre-trial statements where the questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement. In this case, as I understand it, and correct me if I'm wrong, you're arguing that the statements are inconsistent because the pre-trial statement omitted exculpatory details. Now, it seems to me if every omission is an inconsistency, we lose the critical distinction between inconsistency and silence, which was established in the Anderson case. Well, I would try to draw a distinction, Judge Nelson, between several different things. One is silence after an invocation. Okay? And there are other cases in this circuit that say pre-Miranda silence, unless in certain circumstances you can't use that. Then there's omissions during an interview. And I would suggest that Achilla and Monteluta. To me, the way I read this, it just tells me that he invoked his right to remain silent after he got into the interview. We have no problem with that. And what is now happening with Mr. Skeros and the witnesses that these questions, any point during the interview, the defendant talked to you about a man named Nieto. No. You're using his silence to draw the inference that he's holding back, that he's not truthful. And the impression that you're trying to create is that this is a person who's holding back. This is a person who's not truthful. So you're exploiting his invocation of his right to remain silent. One thing I should mention. Isn't that what you're doing? I don't believe so. Then why did you do it? It's to draw the contrast between one picture of events. I walked across the border and my dad was there with a dune buggy and a trailer. And another picture of events, which is very, very elaborate and full of detail. Now, I would suggest that's not a question of silence. It's certainly not post-invocation silence. It's not saying, oh, he invoked and then he shut up. It's saying those crucial details were omitted from that first picture in a way that makes that first picture look very different from the second picture. Well, in other words, they were omitted. Was the question asked? It was designed to elicit this information about a man named Nieto. Was a question asked about that? Mr. Kragerson, the testimony of the defendant on Sir Roboto, I should mention that, the defendant had the opportunity to testify twice to explain away the inconsistency on Nieto. That's not my question. My question is, during that period of the interview, was he asked a question that was designed to bring out whether he had talked to a man named Nieto? What he said, Judge Kragerson, was, I was asked that question several times and I was asked a question that led to the picture of, I walked across the border and my dad was there several times. I got confused. I didn't mean to give that picture, but I wasn't asked all the questions. And, in fact, he said, I wasn't asked all the questions that they're now claiming I didn't provide the detail to. So what I'm suggesting is they had... Mr. Skrittles didn't ask that question. The defense counsel did, in direct, on the Sir Roboto. And this is at pages 391, 392. And the defendant's testimony was they didn't really ask it. They didn't really ask that question. That was in reference to, did you say anything about your dad just purchased it? And the response was they didn't really ask that question. So what I'm trying to suggest is these, the defendant, it is true that the defendant invoked 20 minutes after waving. But it's also true that the defendant asked for and got the opportunity to explain away what the government was portraying as the inconsistent pictures. And took it. It's just that the jury didn't believe it for all kinds of reasons. So that's what I'm suggesting. So, yes, that question was asked, but it was asked by defense counsel of her and her own client. Is that when he said, I don't remember, I don't remember, I don't remember? Yes. Correct. Well, that was actually Mr. Skrittles' cross on the Sir Roboto. And, Judge Nelson, I would suggest that what that also shows, that it wasn't just about silence. It was about silence or omissions or inconsistency. It was about demeanor and it was about, there was, the defendant, the son, couldn't even remember what he had told the defendants at the time on this most important day of his, the agents at the time on this most important day. He couldn't remember whether he told them about tacos. He couldn't remember whether he told them about the ants. May have, may not have. Well, was it, ain't this an 18-year-old kid? I think he was young, Your Honor. I don't remember the exact age. He was 18 years old, something like that. Never been in trouble before? I don't know the answer to that question. Never been in trouble before. And, sure, he's going to be nervous. Anybody would be nervous. And never had that experience and you talk about things and, you know, doesn't mean you're going to remember everything. If I'm going to, I would. Here's the way I look at this, and I'm sure you're going to disagree and it's all right. There's a lack of respect for Miranda in law enforcement. There's just a lack of respect for Miranda. Here's a man. You give him his Miranda warnings. He's an 18-year-old kid. He agrees to talk. He talks and then somewhere along the line the officer told him you could stop at any time and invoke your right to remain silent. And he does that. And then these questions are asked of him, which to my mind show a disrespect for his invocation of his constitutional rights. And you don't even need this, do you? Did you need all this? Was that necessary? He's driving the vehicle. You've got all this marijuana in there. You've got all this other stuff. It's funny, Ed. The government didn't offer this evidence in its case in chief. Recall that. Didn't need it in its case in chief. Didn't offer it in its case in chief. This came as a rebuttal case. So, yes, I would say the answer to Judge Preggers' question is yes, didn't need it in the first instance. But when the defendant took the stand and told this elaborate story of tacos, ants, purchasing, et cetera, it became very necessary. Because that story could have meshed with the notion that, yeah, Netto, this guy among the three guys, stuck the marijuana in the trailer, and my dad had to repay him, and he was going to come up, and that's when he was going to get it. So what I'm saying is, no, it was not necessary in the first instance. It did become necessary in the second. Okay. Now. Was that argument made? Well, that's how it arose. It arose as a rebuttal case. Agent Ballard's testimony about the circumstances of the interview. My closing argument, was that argument made? She just made it. Well, they didn't explain why they had to call Agent Ballard, no, but that's how they used Agent Ballard's testimony. So I was just trying to respond to the court's question of, did you really need this evidence? And as a practical matter, the government had decided it didn't need the evidence in the first instance, but when the elaborate story filled with these details, these critical details, came out, it became necessary to go into the interview. And I would just. I just don't understand it. You know, I would like to say two things more on the Doyle issue, if I could, very briefly. One, if I understand the drift of Judge Pragerson's concerns, if someone invokes, say someone is interviewed by agents, waives, and says A through Y at the time of the interview, then invokes, comes to trial, he adds crucial detail Z that is sort of the lynchpin to the whole exculpatory story, and then you say, well, no, the rule that we've announced from this court is you cannot cross-examine that person. How is this taco thing the lynchpin? Well, I'm not saying that it was in that case, but I'm saying. Explain to me how it was. Well, the Netto and the three guys in Just Purchase is the lynchpin, for the reasons that I've given Your Honor before, which is that it's the plausible story of how the marijuana got there, not us, Netto. Now, I will concede that that was not explicitly argued in closing, but that's the whole thrust of the matter. So the rule would be if you invoke the Miranda, this is why it would be a bad rule, at any point in the interview, you've basically self-immunized yourself from cross-examination later on about that whole interview. Well, it's not about inconsistency. The question is silence. Silence. I would suggest it's omissions, and here's the quote I would read for Your Honor from the court from Otero Sanchez. Now, admittedly, this is from another circuit, but it's cited approvingly. Each of two inconsistent descriptions of events may be said to involve silence insofar as it omits facts included in the other version, but Doyle does not require any such formalistic understanding of silence. And there's also a caution, and I believe it's in the McAluda case, against artificial parsing of the questioning on these points. So you have to look at it in context as a whole and as one picture vis-à-vis another picture, and that's what I would suggest about the Doyle matter. If the court has any other questions, I should mention something that causes me a little bit of concern, and that's there was a mention of a reply. And I will represent to the court that I checked on the docket of this circuit, and I didn't see any reply, and I didn't review any reply. I don't know whether I need to say anything more than I said of oral argument, but I will look for the reply, and perhaps counsel can provide it to me so that I can. In a reply brief? That's what I understood Mr. Fykes had mentioned. There was a reply brief. But I didn't review it. I can certainly say that to the court. I also reviewed the docket to see if there was one, and I didn't see it on the docket. I will recheck the docket to be sure that I wasn't mistaken about that. But I just wanted to let you know. Maybe it's in your office. That's possible, but I wasn't trial counsel, so that's the dilemma. And I apologize. I just wanted to mention that to the court. I don't necessarily need to say anything more. I will look at it, and if so, I'd provide it by 28J, two pages as is required. Well, it's not that long. You want to look at it now? Well, actually, if the Court is okay with this, I'd like to shift to the 404B issue. If the Court has questions on it or concerns about it at some point. You're waiting on your time, you know, counsel. If the Court does not want to hear any more, I will certainly take that cue. Well, you got something vital to say? On the 404B, just one thing. Okay. Because Ray went over, too, you know. Important to recognize that the government only introduced the evidence of the April 2005 incident. Father behind Cisneros, who had the marijuana, both cars. One was being registered to the father. The other was registered to the father. There was testimony that it was the father there, never before through the Andrade port of entry, and only one minute behind. So Mr. Mueller's words were, he just happened to be there. All the evidence was a lot different. I mean, it didn't. So he owned the vehicle that carried it? No. He was in the process of registering it. The registration had actually lapsed. As I read the record, the registration had lapsed, and he was in the process of registering it. So, you know, for all intents and purposes, he was a registered owner. And Mr. Cisneros testified, they told me somebody was going to be following me. So it's not just happened to be there. Yeah, yeah. Okay. We got that. And then the only other point is that the other incident, the going through with a non-factory compartment, that was introduced by the son to point the finger at the father. So it was a third-party culpability. The government wasn't allowed to introduce that. It was a third-party culpability argument. So it might bump up the necessity for that because it was the son who wanted to introduce that. And thank you for your indulgence. All right. Thank you. All right. I guess that's it, huh? Well, you went way over your time. But we'll give you one minute to say. I just want to make one point about the surprising that, I mean, the bulk of this argument was made in the reply referring to the Fifth Circuit cases. I tried to find the specific reference. But as Judge Nelson said, silence is not inconsistency. Those are the cases clearly distinguished between those two. Here, just to give an example, what would be a permissible question on silence here would be, there was one inconsistent statement about coming to the border. What would have been permissible is if the prosecutor had said, so you never told the police that you called your dad from the border. So you never told the police that you sat and waited for your dad under the Ramada. Because those are directly connected to the inconsistent statement of what happened when he arrived at the border. Questions about what happened over at the airport, where he went to eat, all these other things are completely unconnected to that inconsistent statement. The cases show that any questions about silence, and this includes Ochoa Sanchez, any questions about silence and Makluta have to be connected to that. All right. That's it. Do you want to say something, too? Okay. All right. Bye. All right. The next matter has been submitted and we'll recess until 9 a.m. tomorrow morning.
judges: Pregerson, Nelson, Fernandez